IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| ARMANDO RODELA-AGUILAR, )<br>)<br>Movant, )<br>)<br>vs. )<br>)<br>UNITED STATES OF AMERICA, )<br>)<br>Respondent. ) | Civil No. 08-0204-CV-W-ODS<br>Crim. No. 05-0132-04-CR-W-ODS |

ORDER AND OPINION GRANTING MOTION FOR POSTCONVICTION RELIEF
PURSUANT TO 28. U.S.C. § 2255

On November 30, 2005, following a two day trial, Armando Rodela-Aguilar ("Rodela") was convicted by a jury of conspiracy to distribute methamphetamine. On May 3, 2006, he was sentenced to 151 months imprisonment. His conviction and sentence were affirmed on appeal. See United States v. Castro-Gaxiola, 479 F.3d 579 (8th Cir. 2007). On March 18, 2008, Rodela filed a Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255, which, construed liberally raises three claims of ineffective assistance of trial counsel: (1) the failure to conduct a handwriting analysis on an important piece of evidence; (2) the failure to investigate and call witnesses; and (3) the failure to seek a minor role reduction at sentencing. The Court appointed counsel to represent Rodela and a hearing was held on December 19, 2008. For the following reasons, Rodela's motion for postconviction relief is granted.

I. BACKGROUND

On February 27, 2005, Reyes Guadalupe Martinez-Ruiz ("Martinez"), Joel Castro-Gaxiola ("Castro"), and Angela Rose Fennell ("Fennell") left San Diego for Kansas City. They drove a Mitsubishi Mirage with a temporary Missouri license tag. The tag had been mailed to Castro in San Diego in an envelope bearing Rodela's name and the return address of a previous residence shared by Rodela and Arturo Navarrete-

Silva ("Navarrete"), and their destination was Navarrete's and Rodela's new residence on Fremont Street in Kansas City.

Navarrete was the subject of a drug trafficking investigation by local police. Detective George Barrios testified at trial that beginning around February 4, 2005, he was in frequent contact with a confidential informant regarding drug activity at the Fremont address. The informant told Detective Barrios that an occupant of the house known as "Shentin" (who later proved to be Navarrete) had shown her a large amount of methamphetamine in a basement bedroom. It is undisputed that Rodela resided in that basement bedroom. The other half of the basement contained a workshop area, which was attached to a garage. The informant's communications with law enforcement included numerous references to Navarrete and Navarrete's brother, Ramon. All of the information from the confidential informant was included in a search warrant used to search the residence. Neither the informant, nor the search warrant, mentioned Rodela.

On March 1, 2005, the informant told police that Navarrete had said he was expecting a shipment and that this "material" would arrive that day. Early on March 1, Martinez, Castro, and Fennell arrived at the Fremont address. The informant told police that several men were speaking in the basement, from which Navarrete brought up half a pound of methamphetamine. The informant stated that it appeared Navarrete had recently received the shipment he was expecting. Police set up surveillance of the residence at 8:15 p.m. on March 1. Around 9:00 p.m., four individuals left the house in two separate cars. Officers stopped the vehicles a short distance from the house. Martinez and Navarrete occupied a Nissan Sentra; Castro and Navarrete's brother, Ramon, occupied the Mitsubishi Mirage.

After the vehicles were stopped, the search warrant was executed on the Fremont residence. As the officers were approaching the house, Rodela pulled up in a silver mini van and walked to the front door. Rodela was taken into custody as he was unlocking the door. Officers began their search in the basement bedroom of the residence. Officers found drug paraphernalia, over 307 grams of meth in a PVC pipe under Rodela's bed, and another 334 grams of meth in a closet near Rodela's bed. More drugs and paraphernalia were found in the other half of the basement and in other

2

upstairs areas of the residence.

On March 31, 2005, an indictment charged Navarrete, Castro, Martinez, Fennell, and Rodela with various federal drug violations. Rodela was charged with conspiracy to distribute more than fifty grams of methamphetamine under Count One, and aiding and abetting possession with intent to distribute more than fifty grams of methamphetamine under Count Two. Navarrete and Fennell pled guilty prior to trial. Rodela, Castro, and Martinez proceeded to trial.

## II. DISCUSSION

A claim of ineffective assistance of counsel is governed by the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984). "This standard requires [the applicant] to show that his 'trial counsel's performance was so deficient as to fall below an objective standard of reasonable competence, and that the deficient performance prejudiced his defense.'" Nave v. Delo, 62 F.3d 1024, 1035 (8th Cir. 1995), cert. denied, 517 U.S. 1214 (1996) (quoting Lawrence v. Armontrout, 961 F.2d 113, 115 (8th Cir. 1992)). This analysis contains two components: a performance prong and a prejudice prong.

> Under the performance prong, the court must apply an objective standard and "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," Strickland, 466 U.S. at 690, while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Id. at 689. Assuming the performance was deficient, the prejudice prong "requires proof 'that there is a reasonable probability that, but for a counsel's unprofessional errors, the result of the proceeding would have been different.'" Lawrence, 961 F.2d at 115 (quoting Strickland, 466 U.S. at 694).

Id. Failure to satisfy both prongs is fatal to the claim. Pryor v. Norris, 103 F.3d 710, 713 (8th Cir. 1997) (no need to "reach the performance prong if we determine that the defendant suffered no prejudice from the alleged ineffectiveness"); see also DeRoo v.

United States, 223 F.3d 919, 925 (8th Cir. 2000).

*A. Failure to Analyze Handwriting*

At trial, the jury heard evidence that a Missouri temporary car tag had been mailed to Castro in California, in an envelope bearing Rodela's name and the return address of a previous residence he shared with Navarrete. Rodela argues that his attorney was ineffective for failing to argue to the jury that the handwriting on the mailing label did not match his handwriting, but that it did match Navarrete's. He states he informed his attorney that he was not the person who mailed the envelope to California. At the hearing his attorney, Lisa Nouri, testified that she never sought a handwriting analysis. "[U]nder Strickland 'reasonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories.'" Morales v. Ault, 476 F.3d 545, 556 (8th Cir. 2007) (quoting Foster v. Lockhart, 9 F.3d 722, 726 (8th Cir. 1993)). While counsel made a vague reference to Rodela's handwriting contained on a Miranda waiver form that was admitted into evidence and implied there was some dissimilarity to the mailing label, she failed to convey the distinctions in the handwriting or offer Navarrete's handwriting for comparison.

The Court concludes Rodela's attorney did not act in an objectively competent manner in failing to analyze the handwriting on the mailing label. The label bearing Rodela's name was the most important piece of evidence presented to the jury tying Rodela to the conspiracy. The evidence that the drugs were found in Rodela's room could be explained by the bedroom's proximity to the garage and location outside the normal traffic patterns of the house. The jury heard evidence that Rodela was not even present at the residence, or in the bedroom, while the other conspirators were preparing to distribute the drugs from his bedroom. The confidential informant provided no information linking Rodela to the drug activity at the house. Therefore, counsel's failure to attack the authenticity of the mailing label was a critical omission.

Additionally, the Court finds that Rodela's defense was prejudiced by counsel's failure. After reviewing Rodela's handwriting on the Miranda waiver form and the

4

Case 4:08-cv-00204-ODS   Document 30   Filed 01/08/09   Page 4 of 10

pleadings he has signed in this action, the Court finds that the handwriting on the mailing label does not match Rodela's, but rather, matches Navarrete's. Even without expert testimony, a comparison could have been made by the jury, see Fed. R. Evid. 901(b)(3), and the jury would probably have drawn the same conclusion as the Court if Rodela's attorney had presented the handwriting of Rodela and Navarrete for comparison to the label. With the most important piece of evidence linking Rodela to the conspiracy removed, the Court concludes there is a reasonable probability the jury would have returned a verdict of not guilty.

*B. Failure to investigate and call witnesses*

<u>i. Rodela's employers</u>

Rodela argues that his attorney was ineffective for failing to investigate and call as witnesses his three employers. Peter Medina, the owner of Cantina El Mexicano Y Restaurante, testified at the postconviction hearing. He stated that Rodela worked at his restaurant as a singer and keyboarder from October 2004 to March 2005. He testified that on March 1, 2005, the day the methamphetamine was being distributed, Rodela was at the restaurant from around 3:30 p.m. to around 9:00 p.m. Mr. Medina also testified that he never saw Rodela use or sell drugs at work. He stated that Rodela's attorney never contacted him before the trial, but that he would have testified if he had been asked.

Jaime Vergil, the owner of El Molino Restaurant and Bar, also testified at the hearing that Rodela was a musician at his restaurant from January 2001 to March 2005. He testified that he was a punctual and reliable employee and that he never saw Rodela deal drugs. Mr. Vergil also testified that he was never contacted by Rodela's attorney before the trial, but that he would have testified if he had been asked.

Rodela also worked as a musical instructor and producer at Loaiza Records and Promotions from August 2004 to March 2005. Nieves Loaiza, President of the Loaiza Records, submitted a letter as part of Rodela's motion for post-conviction relief. In his letter, Mr. Loaiza described Rodela as a dedicated and hard-working employee. Mr. Loaiza could not be located to testify at the hearing.

5

Ms. Nouri testified that Rodela told her about his employers and asked that they testify on his behalf, but she never attempted to contact them. She explained that she did not think their testimony would be beneficial because establishing that Rodela was a musician would not controvert the Government's assertion that he was a member of the conspiracy. Ms. Nouri stated that she believed that if Rodela's employers had testified at trial, the jury would have learned that Rodela was an illegal alien, that he was paid under the table, that he was sometimes tipped with cocaine rolled up in dollar bills, and that one of the restaurants, El Molino, was known for its involvement in drug trafficking.

The Court concludes that Rodela's attorney was ineffective for failing to call Peter Medina as a witness. The jury heard evidence that Rodela was not at home while the other conspirators were in his bedroom dividing the methamphetamine. However, Peter Medina's testimony that Rodela was working during the hours the drugs were being distributed from his bedroom would have further removed him from the conspiracy, particularly after the link between Rodela and the temporary tag was properly attacked. The benefit of providing an explanation for his whereabouts would have outweighed any harm caused by the revelation that Rodela was not legally employed. While the Court agrees that Rodela could have been a member of the conspiracy even if he was not present while some conspiratorial activities were taking place, the Court concludes that Mr. Medina's testimony, combined with the jury's likely conclusion that Rodela was not the person that mailed the temporary car tag to California, would have changed the jury's verdict to not guilty.[1]

### ii. Arturo Navarrete-Silva

Rodela also argues his counsel was ineffective for failing to interview and call as a trial witness Arturo Navarrete-Silva. An affidavit purportedly signed by Navarrete was

---

[1] Conversely, counsel's decision to not present the testimony of Jaime Vergil was within the wide range of competent trial strategy. Mr. Vergil would not have provided the jury with information on Rodela's whereabouts during conspiratorial activities, and his testimony may have been harmful to Rodela's case if the jury learned El Molino was implicated in drug trafficking. Likewise, without knowing exactly how or if Mr. Loaiza would have testified, the Court cannot conclude counsel was ineffective in failing to call him as a witness.

Case 4:08-cv-00204-ODS   Document 30   Filed 01/08/09   Page 6 of 10

included as an exhibit to Rodela's motion for postconviction relief. The affidavit describes the time line and details of the conspiracy and states that Rodela was not aware of the conspiracy or involved with it in any way, and that Navarrete wrote Rodela's name on the mailing label. The affidavit also states that Navarrete was willing to testify on Rodela's behalf at trial. Navarrete was subpoenaed to testify at the postconviction hearing. However, immediately upon taking the witness stand, he refused to answer questions and asserted his Fifth Amendment rights on advice of counsel. Therefore, without substantiation for the claims made in the affidavit or even confirmation that Navarrete wrote it,[2] the affidavit has no evidentiary value in this action.

Ms. Nouri testified at the hearing that Rodela had informed her that he wanted Navarrete to testify on his behalf. She contacted Navarrete's attorney, Chris Harlan, on two occasions. Mr. Harlan told Ms. Nouri that he would advise his client to assert his Fifth Amendment rights if called as a witness. He also stated that even if Navarrete did testify, the testimony would be harmful to Rodela's defense. These conversations occurred both before and after Navarrete decided to plead guilty. Contrary to Rodela's assertions, Navarrete's Fifth Amendment privilege against self-incrimination did not cease upon his pleading guilty, but rather, continued through his sentencing, which occurred after Rodela's trial. See Mitchell v. United States, 526 U.S. 314, 326 (1999).

Rodela argues that his attorney should have attempted to independently investigate whether Navarrete was willing to testify and what his testimony would have been. However, Ms. Nouri could not ethically contact Navarrete. See Missouri Rule 4-4.2 of the Rules of Professional Conduct. Therefore, she had to accept Mr. Harlan's representation that he would advise Navarrete to exercise his Fifth Amendment rights. Ms. Nouri could not call Navarrete to the stand simply to force him to invoke his right to remain silent in the presence of the jury. See United States v. Doddington, 822 F.2d 818, 822 (8th Cir. 1987). Likewise, it would have been unreasonable for her to do so, in light of Mr. Harlan's statement that his testimony would be harmful to Rodela's case.

---

[2] The Court notes that the signature on the affidavit matches the handwriting on the signature in Navarrete's plea agreement. However, without Navarrete's testimony that he prepared and signed the affidavit, the Court cannot consider it.

7

Therefore, the Court cannot conclude Ms. Nouri's performance was deficient in not calling Navarrete as a witness.

Even if the Court believed Ms. Nouri should have done more to investigate Navarrete as a witness, the Court cannot find that Rodela's defense was prejudiced without Navarrete's testimony. At the postconviction hearing, Navarrete refused to testify. Without knowing what Navarrete's testimony would have been at trial, the Court cannot conclude Rodela's defense was prejudiced without it.

*C. Failure to Argue for Minor Role Reduction at Sentencing*

At Rodela's sentencing, Ms. Nouri explained her reason for not seeking the minor participant reduction: "I specifically did not ask for a minor participant reduction because that would be completely opposite of the defense of no knowledge to say that you had some minor or minimal knowledge." Sentencing Tr. at 4. At the postconviction hearing, Ms. Nouri continued to assert her belief that a minor participant reduction was not available to a defendant who has maintained his innocence. Counsel's decision to not pursue the reduction was based on a misunderstanding of the law.

A minor role adjustment is intended "for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant," U.S.S.G. § 3B1.2, comment, (backg'd), "but whose role could not be described as minimal." Id., comment. "A defendant's role in the offense is measured by the relevant conduct for which he is held responsible," United States v. Thurmon, 278 F.3d 790, 792 (8th Cir. 2002), not by what the defendant admits to. See United States v. Yirkovsky, 338 F.3d 914 (8th Cir. 2003) (defendant denied guilt but still given minor participant reduction). "The propriety of a downward adjustment is determined by comparing the acts of each participant in relation to the relevant conduct for which the participant is held accountable and by measuring each participant's individual acts and relative culpability against the elements of the offense." United States v. Ramos-Torres, 187 F.3d 909, 915 (8th Cir. 1999).

Under Strickland's performance prong, the Court finds counsel's failure to pursue a minor role reduction because of her misunderstanding of the law falls outside the wide

8

Case 4:08-cv-00204-ODS   Document 30   Filed 01/08/09   Page 8 of 10

range of competent assistance.  Viewed in the light most favorable to the Government, the evidence at trial was that Rodela mailed a temporary car tag to co-conspirators in California and that his room was used for storing large quantities of methamphetamine.  However, Rodela's conduct, unlike the other members of the conspiracy, did not include transporting, handling, and distributing the drugs.  Therefore, Rodela would have been eligible for the minor role reduction.  At sentencing, the Court found a total offense level of 34, a criminal history category of I, and a sentencing range of 151 to 188 months.  The Court sentenced Rodela on Counts 1 and 2 to concurrent terms of 151 months custody.  The Court ordered 5 years supervised release on Counts 1 and 2, the terms to run concurrently.  A $200 special assessment was ordered.

If Ms. Nouri had argued that Rodela's sentence should have been reduced because of his minor role in the offense, the Court would have applied a three level reduction, making Rodela's total offense level a 31.  Rodela's new sentencing range would have been 108 to 135 months, with a mandatory minimum sentence of 120 months.  Based on the Court's decision to sentence Rodela at the bottom of his previous guideline range, the Court likely would have sentenced him to the bottom of his revised guideline range to 120 months on both Counts, and certainly to less than the 151 months Rodela received.  Accordingly, the Court concludes that Rodela was prejudiced by his attorney's failure to seek the reduction.[3]

### III. CONCLUSION

The judgment is vacated and Rodela is granted a new trial.  Even if a new trial were not warranted, his sentence would be vacated and a new sentencing proceeding initiated.

---

[3] Rodela also argues the his attorney was ineffective for failing to raise the sentencing error on appeal.  However, because Ms. Nouri did not object to the Presentence Report's failure to recommend a minor role in the offense adjustment, there was no error preserved for appeal.

9

IT IS SO ORDERED.

                                                       /s/ Ortrie D. Smith
                                                       ORTRIE D. SMITH, JUDGE
DATE: January 8, 2009                         UNITED STATES DISTRICT COURT

10

Case 4:08-cv-00204-ODS   Document 30   Filed 01/08/09   Page 10 of 10